# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

GWENDOLYN STITZEL,       :
      :
      Plaintiff       :     No. 3:16-CV-0391
      :
vs.       :     (Judge Nealon)
      :
NANCY A. BERRYHILL,[1] Acting    :
Commissioner of Social Security,    :
      :
      Defendant       :

**FILED**
**SCRANTON**

NOV 1 4 2017

PER _____
/ DEPUTY CLERK

## MEMORANDUM

On March 4, 2016, Plaintiff, Gwendolyn Stitzel, filed this instant appeal[2]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

§ 1461, et seq. and denying her application for supplement security income

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for former Acting Commissioner, Carolyn W. Colvin, as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq.

(Doc. 1). The parties have fully briefed the appeal. For the reasons set forth

below, the decision of the Commissioner denying Plaintiff's applications for DIB

and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on August 29,

2012, alleging disability beginning on September 17, 2011, due to a combination

of "Depression, Panic Disorder, and shoulder, back, and neck pain." (Tr. 13,

206).[4] These claims were initially denied by the Bureau of Disability

Determination ("BDD")[5] on October 4, 2012. (Tr. 13). On November 20, 2012,

Plaintiff filed a written request for a hearing before an administrative law judge.

(Tr. 13). An oral hearing was held on March 18, 2014, before administrative law

judge Patrick S. Cutter, ("ALJ"), at which Plaintiff testified, and a supplemental

---

3. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits. A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on June 29, 2016. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

hearing was held before the ALJ on June 25, 2014, at which impartial vocational expert Michael J. Kibler, ("VE"), testified. (Tr. 13). On August 1, 2014, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. (Tr. 13). On September 11, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On January 8, 2016, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-5). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on March 4, 2016. (Doc. 1). On June 29, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on August 9, 2016. (Doc. 12). Defendant filed a brief in opposition on October 12, 2016. (Doc. 16). Plaintiff filed a reply brief on October 21, 2016. (Tr. 17).

Plaintiff was born in the United States on May 8, 1979, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 213). Plaintiff obtained her GED in 2001, and can communicate in English. (Tr. 205, 207). Her

_____

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

employment records indicate that she previously worked as a hostess, waitress, housekeeper, an office cleaner, and a prep cook. (Tr. 249). The records of the SSA reveal that Plaintiff had earnings in the years 1997 through 2009. (Tr. 183). Her annual earnings range from a low of five hundred twenty-eight dollars and zero cents ($528.00) in 1997 to a high of thirteen thousand six hundred one dollars and ninety-two cents ($13,601.92) in 2003. (Tr. 183). Her total earnings during these twelve (12) years were eighty-five thousand one hundred sixty-three dollars and seventy-nine cents ($85,163.79). (Tr. 183).

In a document entitled "Function Report - Adult" filed with the SSA on September 19, 2012, Plaintiff indicated that she lived in a house with her two (2) children. (Tr. 225). From the time she woke up to the time she went to bed, Plaintiff got her children ready and off to school, rested, helped her children with homework and took them to scheduled events, and made dinner. (Tr. 227). Her mother helped her clean her house, do laundry, cook, and take care of her children. (Tr. 227). She had difficulty with personal care tasks such as dressing and bathing due to pain in her shoulders and neck. (Tr. 227). She was able to drive a car unaccompanied and went to the grocery store twice a month, but noted that "since fall and sciatica mom has been going for me." (Tr. 229). She was able to walk a quarter to half a block before needing to stop and rest for a few minutes before

resuming walking because it was "just very painful." (Tr. 231). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, or seeing. (Tr. 231).

Regarding concentration and memory, Plaintiff needed special reminders to take care of her personal needs, to take her medicine, and to go places. (Tr. 228, 230). She could pay bills, handle a savings account, use a checkbook, and count change. (Tr. 229). She indicated that she was not able to finish what she started, could not pay attention for long because she would "drift or go blank," could follow written and spoken instructions "pretty well," and did not handle stress or changes in routine well. (Tr. 231-232).

Socially, Plaintiff did not leave her house often because she had "no desire" and it was "hard to get around." (Tr. 229). She indicated that she went to her children's sports activities and school events on a regular basis. (Tr. 230). When she did leave home, she was able to do so unaccompanied. (Tr. 229). Her hobbies included reading, watching television, crafting, decorating, and sports, and she indicated she did these activities every day and "very well." (Tr. 230). She spent time with her mother, children, and a friend daily. (Tr. 230).

At her oral hearing on March 18, 2014, Plaintiff testified that she was unable to work due to a combination of Depression, Panic Disorder, and pain in

her neck, shoulders, and back. (Tr. 49). Regarding her back pain, she stated it was constant; was a ten (10) out of (10) on the pain scale; was aggravated by standing, sitting, and lying down; caused a need to reposition every fifteen (15) to twenty (20) minutes; was relieved somewhat by heat; and caused her to need a prescribed cane to walk. (Tr. 49, 55-56). She indicated she had surgery to replace discs L4 and L5 in August 2013, which gave her relief for several weeks, with the pain returning and worsening shortly thereafter and with a new symptom of numbness in her legs and groin occurring. (Tr. 50, 58). She indicated that, regarding her shoulder and neck pain, the pain was located in her right shoulder and right side of the neck. (Tr. 51). Regarding depression and anxiety, Plaintiff testified that her symptoms included panic and phobia of people and that she was taking Seroquel, Paxil, and Lorazepam for these problems, which helped with the panic attacks in that she had them a few times a week as opposed to daily. (Tr. 52). She indicated she was also attending therapy with her doctor once a month and with a therapist every two (2) weeks to once a month. (Tr. 52). Regarding limitations, Plaintiff stated she was able to stand for about twenty (20) minutes in the same spot, could walk on a flat surface for maybe ten (10) steps before needing to rest, had difficulty sitting back because of the pressure it caused on her tailbone, was not able to lift anything heavy, was unable to bend down to tie her shoes, and

was unable to lift her right arm up to put on clothing.  (Tr. 52-53, 57).

**MEDICAL RECORDS**

### A.  **Medical Evidence**

On September 28, 2011, Plaintiff had an appointment with Angelique Clemson, D.O., for right upper extremity discomfort for the past six (6) years with numbness and tingling into her hand and nighttime paresthesias. (Tr. 414).  A physical examination revealed that her right shoulder had excellent range of motion, no tenderness, and intact sensation and motor function, but also had loss of grip strength. (Tr. 414).

On October 18, 2011, Plaintiff underwent an EMG due to right arm and neck pain and numbness. (Tr. 404).  The impression was that while there was no evidence of peripheral neuropathy, radiculopathy or myopathy in the right upper extremity, her study results were "supportive of a diagnosis of carpal tunnel syndrome in the right upper extremity." (Tr. 404).

On November 3, 2011, Plaintiff underwent right carpal tunnel release. (Tr. 415).  On November 14, 2011, a follow-up visit noted that Plaintiff had full motion and good color, normal sensation and motor function, and no restrictions. (Tr. 411).

On April 17, 2012, Plaintiff presented to the emergency room of Lewistown

7

Hospital for left lower back pain radiating into her abdomen. (Tr. 492). It was noted that the pain onset was just prior to arrival and that it was constant, severe, and achy. (Tr. 492). A physical examination was normal. (Tr. 493). X-rays showed unfused apophysis in the anteroinferior aspect of L5 with superimposed spurring. (Tr. 494). Plaintiff was diagnosed with lumbar pain and sprain and sciatica, and was prescribed Vicodin for pain. (Tr. 493).

On April 26, 2012, Plaintiff had an appointment with Dr. Clemson for follow-up from her emergency room visit. (Tr. 495). Plaintiff reported her back was still sore, but was better, and that she had pain radiating down her left leg at times. (Tr. 495). Her problem list at this appointment included Depressive Disorder, major single episode, and Panic Disorder without Agoraphobia. (Tr. 496). A physical examination revealed: normal gait; normal extremities; attentiveness with an ability to concentrate; articulate and fluent speech; a cooperative attitude; an appropriate affect; and no apparent anxiety, depression, or agitation. (Tr. 496). Plaintiff was assessed as having sciatica and lumbago. (Tr. 497). Plaintiff was prescribed Prednisone and a muscle relaxer and was told to perform gentle range of motion exercises and stretching. (Tr. 497).

On June 9, 2012, Plaintiff had an appointment with Dr. Clemson for follow-up of chronic conditions, which included Depression, anxiety, shoulder pain, neck

8

pain, reflux, and carpal tunnel syndrome. (Tr. 720). A physical examination revealed: a normal gait; a cooperative attitude; an appropriate affect; fluent and articulate speech; attentiveness with the ability to concentrate; orientation to time, place, and person; no apparent anxiety, depression, or agitation; and normal extremities. (Tr. 721). Plaintiff was instructed to follow-up in four (4) to six (6) weeks. (Tr. 722).

On September 5, 2012, Plaintiff had an initial appointment with Shari Schrack, CRNP, ("Nurse Schrack"), at Penn State Hershey Medical Group to establish care after being released from Dr. Clemson's care for missing too many appointments. (Tr. 502). It was noted that an MRI of the right shoulder showed arthritic changes of the right AC joint and "DJD in the lumbar spine" with normal sacroiliac joints and a normal MRI of the cervical spine. (Tr. 502). A physical examination was normal. (Tr. 503-504). Plaintiff was assessed as having chronic neck, back, and right shoulder pain, depression, and panic attacks. (Tr. 504).

On September 26, 2012, Plaintiff had an appointment at Universal Community Behavioral Health for symptoms of depression and low self-esteem. (Tr. 508). A mental status examination revealed: a relaxed posture; clean grooming; a cooperative attitude; fair eye contact; orientation to time, place, and person; good immediate recall and recent and remote memory; good reliability;

9

fair abstract reasoning, insight, judgment, and impulse control; good concentration; clear and appropriate perception; normal speech and thought process; appropriate thought content and psychomotor behavior; and a tearful affect. (Tr. 515-516). Plaintiff's Axis I diagnoses included Major Depression, recurrent and moderate, and Panic Disorder with Agoraphobia. (Tr. 516). It was recommended Plaintiff participate in outpatient treatment. (Tr. 516).

On September 28, 2012, Plaintiff underwent an MRI of her lumbar spine after a fall. (Tr. 616). The impression was that Plaintiff had a left foraminal disc protrusion with compromise of the left neural foramen at L5-S1 and a mild annular bulge at L4-L5. (Tr. 616).

On March 14, 2013, Plaintiff had a follow-up appointment with Subaila Zia, M.D., after she was hospitalized for pneumonia. (Tr. 727-731). It was noted that Plaintiff's CT scan showed "bilateral ground glass opacities along with some mediastinal lymphadenopathy up to 1 cm in short axis . . . and bilateral adrenal nodules." (Tr. 727). It was noted that Plaintiff smoked a half a pack of cigarettes a day. (Tr. 727). A physical examination revealed bilateral expiratory wheezes and decreased breath sounds bilaterally and a cooperative attitude. (Tr. 729). The plan was to repeat a CT scan of the chest in four (4) weeks to see if the lung findings had resolved and to undergo an MRI of the abdomen for the adrenal

10

nodules. (Tr. 729).

On April 5, 2013, Plaintiff had an appointment with Nurse Schrack for findings of incidental bilateral adrenal nodules. (Tr. 771). A physical examination revealed: no lower extremity edema; bilaterally clear lungs with normal expansion; and an appropriate mood and affect. (Tr. 772). A repeat CT scan was ordered and to be completed in November 2013 to follow the adrenal nodules. (Tr. 772).

On April 23, 2013, Plaintiff had a follow-up appointment with Dr. Zia for ongoing shortness of breath, cough, and hypersomnia. (Tr. 732). It was noted that Plaintiff' CT scan of the chest performed on April 1, 2013 did not show any nodules, effusion, or mediastinal adenopathy. (Tr. 734). Dr. Zia concluded that Plaintiff had bronchial asthmam and a stable mediastinal adenopathy. (Tr. 734). Plaintiff was switched from Advair to Symbicort, had her proton pump inhibitor dose increased, and was to have a follow-up CT scan in six (6) months to follow the mediastinal adenopathy. (Tr. 735).

On June 17, 2013, Plaintiff had an appointment with John C. Sefter, D.O., for back and leg pain on her left side. (Tr. 761). Plaintiff reported that her pain was significant, caused lower extremity difficulty, was worse with standing and walking, and was not improved with many activities. (Tr. 761). An examination

11

revealed: nervousness and slight anxiety; mild pain with percussion; some pain with palpation to the back, buttock, and lower extremity towards the hip; minimal pain with straight leg raising; good flexion and extension for her hip and knees with good rotation of the hip; no swelling of the extremities; and limited flexion and extension of the lumbar spine reduced by thirty percent (30%) for someone her age and stature. (Tr. 762). It was noted that x-rays revealed thirty (30) degrees of lumbar lordosis; a degenerative disc at L5-S1; low-grade spondylolisthesis; disc herniation at L5-S1 on the left side with nerve root impingement; and a mild degree of degenerative changes. (Tr. 762). An epidural steroid injection at L5-S1 was recommended as was a back brace for support, and the benefits and risks of surgery were discussed. (Tr. 762).

On July 5, 2013, Plaintiff had an appointment with Dr. Sefter for back pain of one (1) year duration that was worsening and was decreasing functional disability. (Tr. 759). Plaintiff noted that her pain was located in the lumbar area, was rated at a nine (9) out of ten (10), was aggravated by activity, including ambulation and flexion or extension, and was alleviated by "getting off her feet and rest[t]ing." (Tr. 759). An examination revealed: appropriate mood and affect; pain with percussion at the L5-S1 level; pain with forward flexion and straight leg raising; and pain at the facet joints. (Tr. 759). It was noted that images from "a

few weeks ago demonstrat[ed] severe degenerative changes at L5-S1," including a left paracentral disc herniation and formaminal herniation at the L5-S1 level with nerve root impingement. (Tr. 759). Dr. Sefter recommended surgery to correct these issues. (Tr. 759).

On July 16, 2013, Plaintiff had an appointment with Dr. Sefter for a pre-operative evaluation for back pain, lower extremity difficulty, increasing pain, and decreasing walking ability. (Tr. 756). It was recommended that Plaintiff undergo posterior lumbar spine decompression surgery for the L5-S1 segment with a possible need for posterior lumbar interbody device to stabilize and elevate the L5-S1 segment. (Tr. 756).

On July 23 2013, Plaintiff underwent posterior lumbar decompression, laminectomy, and foraminotomy bilaterally with a complete discectomy and posterior lumbar interbody fusion at the L5-S1 level. (Tr. 769). The procedure was performed by Dr. Sefter. (Tr. 769).

On July 31, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Sefter. (Tr. 754). It was noted that Plaintiff was improving. (Tr. 754). Plaintiff was fitted for a back brace, was given Valium for muscle spasticity and Dilaudid for breakthrough pain, was instructed to quit smoking, and was instructed to follow-up in a week. (Tr. 754).

On August 7, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Sefter. (Tr. 753). It was noted that Plaintiff was doing better. (Tr. 753). Plaintiff was instructed to wear a brace for support and to follow-up in three (3) to four (4) weeks. (Tr. 753).

On September 4, 2013, Plaintiff had an appointment with Dr. Sefter sixty (60) days after the lumbar spine fusion of the L5-S1. (Tr. 752). It was noted that Plaintiff had "some aches and pains and myalgias, but truly no back pain and no neurological complaints to the extremities." (Tr. 752). Dr. Sefter also noted the following: "Looking at the whole person, she desperately needs to quit cigarette smoking. Instructions and precautions were given. Back brace is optional. Back in 60 days. I think I can get her back to work in 60 days as well." (Tr. 752).

On December 5, 2013, Plaintiff had an appointment with Dr. Zia for cough and increased shortness of breath. (Tr. 737). It was noted that Plaintiff had been smoking one (1) pack of cigarettes per day. (Tr. 738). An examination revealed lungs had diminished bilateral air entry and expiratory wheezes. (Tr. 739). It was noted that a CT scan performed on this date showed no infiltrate, no pulmonary nodule, and no lymphadenopathy. (Tr. 739). Dr. Zia diagnosed Plaintiff with asthma exacerbation secondary to bronchitis and tobacco use disorder. (Tr. 739). Plaintiff was instructed to taper her Prednisone dose, to use Levofloxacin for a

week, and to follow-up in six (6) months.  (Tr. 739).

On December 12, 2013, Plaintiff underwent an EMG for leg pain and numbness, peripheral neuropathy, and back pain.  (Tr. 524).  Plaintiff's EMG was supportive of a diagnosis of chronic L5-S1 radiculopathy in both lower extremities with evidence of peripheral neuropathy in both lower extremities.  (Tr. 524).  Clinical correlation with an MRI of the lumbar spine was recommended.  (Tr. 524).

On March 3, 2014, Plaintiff had an appointment with Rasik Parmar, M.D., of Lewistown Neurology Associates, Inc., for complaints of back pain; leg pain, numbness, and tingling; and difficulty walking.  (Tr. 777).  A physical examination revealed: tenderness in the lower back; normal recent and remote memory; normal attention span and concentration; normal shoulder shrug strength; 5/5 motor strength in all extremities; a normal sensory exam; and a normal gait. (Tr. 777).  It was noted that an EMG showed peripheral neuropathy and L5-S1 radiculopathy in both lower extremities, and Plaintiff was instructed to begin taking Neurontin for this problem.  (Tr. 778).

On March 6, 2014, Plaintiff had an appointment with Dr. Sefter for lower extremity difficulty, pain, and an inability to ambulate.  (Tr. 775).  A physical examination revealed: no gait abnormality; normal reflexes of the lower

extremities bilaterally; 5/5 motor strength with dorsiflexion-plantar flexion and inversion-eversion to the extremities; intact sensation in the lower extremities bilaterally; and negative straight leg raising tests. (Tr. 775). Dr. Sefter ordered an MRI of her lumbar spine. (Tr. 775).

On March 14, 2014, Plaintiff underwent an MRI of her lumbar spine. (Tr. 747). The conclusion was that Plaintiff had: an L4-L5 mild diffuse disc bulge that produced mild to moderate spinal stenosis; an L5-S1 diffuse disc bulge/ osteophyte complex and post-surgical metallic fixation hardware susceptibility artifact from L5-S1; and some degenerative disc desiccation and loss of height of the L4-L5 and L5-S1 intervertebral discs. (Tr. 747-748).

On April 30, 2014, Plaintiff had a follow-up appointment with Dr. Parmar for back and leg pain, numbness, and tingling. (Tr. 779). It was noted that Neurontin had not been helping completely. (Tr. 779). Plaintiff's examination revealed tenderness in the lower back, a decreased left ankle jerk, and a decreased pinprick sensation in the L5 distribution in both legs. (Tr. 779). Plaintiff's Neurontin dose was increased and it was noted that an MRI of the lumbar spine showed bulging discs and some fusion. (Tr. 779).

From April 29, 2014 through May 26, 2014, Plaintiff attended physical therapy at Drayer Physical Therapy. (Tr. 784-785). The notes from these visits

are completely illegible. (Tr. 784-785).

On May 5, 2014, Plaintiff had an appointment with Champa Abeysinghe, M.D. for back pain, depression, anxiety, and neuropathy. (Tr. 789). A physical examination was normal. (Tr. 790). Bloodwork was ordered, and Plaintiff was instructed to follow-up in six (6) months. (Tr. 790-791).

On June 20, 2014, Plaintiff had an appointment with Dr. Abeysinghe for leg pain after a recent fall and requested that she be referred for pain therapy as well as spinal rehabilitation. (Tr. 801). It was noted that Plaintiff had not been following up with a psychiatrist or therapist due to problems with transportation and that she had not been taking her medications for the past two (2) weeks. (Tr. 801). Plaintiff's active problem list included adrenal adenoma; depression; anxiety; status post spinal surgery; peripheral neuropathy; Major Depressive Disorder; tobacco use disorder; and Panic Disorder without Agoraphobia. (Tr. 802). An examination was normal. (Tr. 802-803). Plaintiff was referred to pain therapy and spinal rehabilitation. (Tr. 803).

### B. **Medical Opinions**

On September 26, 2012, Melissa Diorio, Psy.D., completed a Psychiatric Review Technique for Plaintiff's mental health impairments. (Tr. 66-67). Dr. Diorio opined that, for Impairment Listings 12.04, Affective Disorders, and 12.06,

Anxiety-Related Disorders, Plaintiff did not satisfy the "B" or "C" criteria, because she had: (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation. (Tr. 66). On this same date, Dr. Diorio also completed a Mental Residual Functional Capacity Assessment form. (Tr. 70-71). Dr. Diorio opined Plaintiff was moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 70-71). Dr. Diorio further opined Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (Tr. 71).

On September 26, 2012, Abu Ali, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. 68-69). Dr. Ali opined Plaintiff could: (1) occasionally lift and/ or carry up to twenty (20) pounds; (2) frequently lift and/ or carry up to ten (10) pounds; (3) stand, walk and/ or sit for about six (6)

hours in an eight (8) hour workday; (4) engage in unlimited pushing and pulling within the aforementioned weight restrictions; (5) occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and (6) occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 68-69). He further opined Plaintiff should avoid even moderate exposure to hazards such as machinery and heights. (Tr. 69).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether

a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2012. (Tr. 16). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of September 17,

2011. (Tr. 15).

At step two, the ALJ determined that Plaintiff suffered from the following medically determinable impairments: right shoulder AC joint degeneration, lumbar degenerative disc disease, depression, and anxiety. (20 C.F.R. 404.1521 and 416.921)." (Tr. 16).

At step three of the sequential evaluation process, the ALJ determined the following: "Plaintiff does not have an impairment or combination of impairments that have significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, [Plaintiff] does not have a severe impairment or combination of severe impairments (20 C.F.R. 404.1521 and 416.921)." (Tr. 16).

Alternatively, the ALJ determined that even if Plaintiff had severe impairments,

> the record would support no more than a restriction to
> sedentary exertional work except that [Plaintiff] must be able to
> perform the requirements of any occupation either sitting or
> standing; requires a cane for prolonged ambulation; can only
> occasionally climb, balance, stoop, kneel, crouch, and crawl;
> must avoid concentrated exposure to fumes, dust, gases, and
> high humidity; must avoid all exposure to temperature
> extremes and work around unprotected heights or dangerous
> moving machinery; is limited to the performance of routine,
> repetitive 1-2 step tasks involving no more than occasional
> interaction with others, occasional decision making, occasional

changes, and no fast-paced production quotas; is expected to
remain off-task/ unproductive for 5-10 percent of the workday;
and is expected to be absent from work approximately once per
month.

(Tr. 23).

In accordance with this alternative RFC analysis, the ALJ determined the

following at Step Five:

> The undersigned notes that [Plaintiff] has past relevant work as
> a Front Desk Agent, Commercial/ Industrial Cleaner, and
> Kitchen Helper, each actually and customarily performed either
> at or above the light exertional level. Accordingly, because
> exertional demands of the [Plaintiff]'s past relevant work
> would exceed her restrictions to sedentary work tasks,
> [Plaintiff] would be unable to perform her past relevant work.
>
> ........................................................................................................
>
> In the alternative, considering [Plaintiff]'s age, education, work
> experience, and [RFC], there are other jobs that exist in
> significant numbers in the national economy that [Plaintiff] can
> also perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and
> 416.969(a)).
>
> ........................................................................................................
>
> To determine the extent to which these [RFC] limitations erode
> the unskilled sedentary occupational base, the [ALJ] asked the
> [VE] whether jobs exist in the national economy for an
> individual with [Plaintiff]'s age, education, work experience,
> and [RFC]. The [VE] testified that given all of these factors[,]
> the individual would be able to perform the requirements of
> representative occupations such as a Table Worker []; Final
> Assembler[]; and Carding Machine Operator.

.................................................................................................

> Based on the testimony of the [VE], the undersigned concludes
> that, considering [Plaintiff]'s age, education, work experience,
> and [RFC], [Plaintiff] is capable of making a successful
> adjustment to other work that exists in significant numbers in
> the national economy. A finding of "not disabled" is therefore
> appropriate under the framework of the above-cited rule.

(Tr. 23-24).

Ultimately, the ALJ concluded that Plaintiff was not under a disability as

defined in the Social Security Act at any time between the alleged onset date of

September 17, 2011, and the date of the ALJ's decision. (Tr. 25).

## DISCUSSION

On appeal, Plaintiff asserts the following: (1) the ALJ erred at Step Two by

determining that none of Plaintiff's impairments was severe; (2) the ALJ erred in

finding that she did not meet Listing 1.04(A); and (3) the ALJ's evaluation of the

opinion evidence, RFC assessment, and credibility analysis were not supported by

substantial evidence. (Doc. 12, pp. 13-31). Defendant disputes these contention.

(Doc. 16, pp. 8-15).

### 1.    Step Two Evaluation

Plaintiff asserts that substantial evidence does not support the ALJ's

determination that Plaintiff's medically determinable impairments were non-

severe because the objective medical evidence she presented proves otherwise. (Doc. 12, pp. 13-18).

Step Two "'is a threshold analysis that requires [a claimant] to show that he has one severe impairment.'" Traver v. Colvin, 2016 U.S. Dist. LEXIS 136708, at *29 (M.D. Pa. Oct. 3, 2016) (Conaboy, J.) (citing Bradley v. Barnhart, 175 F.App'x 87 (7 th Circuit 2006)).[7] SSR 96-3p states that an impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p. An impairment is severe if it is something beyond a slight abnormality that has no more than a minimal effect on the Plaintiff's ability to do basic work activities.[8] Id.; McCrea v. Commissioner of

---

7. The determination of whether a claimant has a severe impairment that has lasted or is expected to last for a continuous period of at least twelve (12) months, at step two of the Sequential Evaluation Process, is a threshold test. See 20 C.F.R. §§ 404.1509, 404.1520(c) and 416.920(c). A claimant is considered "not disabled" if he or she does not have a severe impairment or combination of impairments that significantly limits his or he physical and/ or mental abilities to perform basic work that has lasted or is expected to last for a continuous period of at least twelve (12) months. Id. If a claimant has a severe impairment or combination of impairments, the evaluation continues. See 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g).

8. Basic physical work activities include the ability to stand, sit, walk, push, pull, carry, climb, reach, crawl, and handle. See 20 C.F.R. §§ 404.1545(b) and 416.921(b). Basic mental abilities includes the ability to understand, remember, and carry out simple instructions, and respond approprriately to supervision, coworkers, and work pressures. Id.

Social Security, 370 F.3d 357, 360 (3d Cir. 2004). "If the claimant can present evidence presenting more than a "slight abnormality," the severity requirement is met. Further, any reasonable doubts in step two should be resolved in the claimant's favor." Striplin v. Colvin, 2016 U.S. Dist. LEXIS 139676, at *13 (M.D. Pa. Oct. 7, 2016) (Munley, J.) (citing Bowen v. Yuckert, 482 U.S. 137, 158 (1987)) (remanding the matter to the Commissioner because substantial evidence did not support the administrative law judge's decision that the plaintiff's lumbar impairment was non-severe as the plaintiff met the burden of presenting evidence that this impairment was more than a slight abnormality and this step two determination was not harmless error because the alternative residual functional capacity provided did not account for physical limitations resulting from the lumbar impairment).

In the case at hand, this Court determines that substantial evidence does not uphold the ALJ's determination that Plaintiff's back impairment was non-severe. Regarding Plaintiff's lumbar impairment, that ALJ noted in the decision that this impairment was non-severe for several reasons. First, after it was discovered in September 2012 that Plaintiff had a herniated disc causing nerve root impingement, this problem was surgically corrected in July 2013, and at a post-operative visit in September 2013, Dr. Sefter, who performed the surgery, noted

that he believed he could get Plaintiff back to work within sixty (60) days. (Tr. 17-18). The ALJ also discusses that Plaintiff missed her follow-up appointments after surgery for several months and did not return to an orthopedist until March 2014, at which time it was noted, that despite some disc dessication, there was no evidence of foraminal narrowing or spinal stenosis and Plaintiff had no gait abnormality, normal reflexes, full motor strength in all extremities, and intact sensation throughout her extremities. (Id.). The ALJ concludes the determination that Plaintiff's lumbar impairment is non-severe by stating the following: "Because these records demonstrate [Plaintiff]'s worsened back problems resolved such that [she] demonstrated normal physical examination findings within 12 months of her noted deterioration, the record suggests [her] musculoskeletal impairment as non-severe." (Tr. 18).

However, this Court finds that substantial evidence does not support this conclusion based on the medical evidence of record and what is seemingly the ALJ substituting his own lay opinion for that of a medical doctor. While the ALJ states Plaintiff's back impairment is non-severe because it did not last for twelve (12) consecutive months, among other reasons, the record does not support this conclusion. Instead, Plaintiff has submitted enough medical evidence that her lumbar impairment is something beyond a slight abnormality that has no more

than a minimal effect on the Plaintiff's ability to do basic work activities. On December 12, 2013, only three (3) months after Plaintiff had a third post-operative follow-up with Dr. Sefter, Plaintiff underwent an EMG for leg pain and numbness, peripheral neuropathy, and back pain. (Tr. 524). Plaintiff's EMG was supportive of a diagnosis of chronic L5-S1 radiculopathy in both lower extremities with evidence of peripheral neuropathy in both lower extremities. (Tr. 524). On March 3, 2014, Plaintiff had an appointment with Rasik Parmar, M.D., of Lewistown Neurology Associates, Inc., for complaints of back pain; leg pain, numbness, and tingling; and difficulty walking, and it was noted that an EMG showed peripheral neuropathy and L5-S1 radiculopathy in both lower extremities, and Plaintiff was instructed to begin taking Neurontin. (Tr. 777-778). On March 6, 2014, Plaintiff had an appointment with Dr. Sefter for lower extremity difficulty, pain, and an inability to ambulate. (Tr. 775). A physical examination revealed: no gait abnormality; normal reflexes of the lower extremities bilaterally; 5/5 motor strength with dorsiflexion-plantar flexion and inversion-eversion to the extremities; intact sensation in the lower extremities bilaterally; and negative straight leg raising tests. (Tr. 775). Despite this normal examination, Dr. Sefter ordered an MRI of her lumbar spine. (Tr. 775). On March 14, 2014, Plaintiff underwent an MRI of her lumbar spine. (Tr. 747). The conclusion was that

Plaintiff had: an L4-L5 mild diffuse disc bulge that produced mild to moderate spinal stenosis; an L5-S1 diffuse disc bulge/ osteophyte complex and post-surgical metallic fixation hardware susceptibility artifact from L5-S1; and some degenerative disc desiccation and loss of height of the L4-L5 and L5-S1 intervertebral discs. (Tr. 747-748). On April 30, 2014, Plaintiff had a follow-up appointment with Dr. Parmar for back and leg pain, numbness, and tingling. (Tr. 779). It was noted that Neurontin had not been helping completely. (Tr. 779). Plaintiff's examination revealed tenderness in the lower back, a decreased left ankle jerk, and a decreased pinprick sensation in the L5 distribution in both legs. (Tr. 779). Plaintiff's Neurontin dose was increased, and it was noted that an MRI of the lumbar spine showed bulging discs and some fusion. (Tr. 779).

While the ALJ supports the decision that Plaintiff's lumbar impairment was non-severe with normal examination findings from these appointments, the medical testing shows another story that undermines the ALJ's reasoning and leads this Court to conclusion that substantial evidence does not support the ALJ's determination the Plaintiff's lumbar impairment was non-severe because Plaintiff has presented evidence of something beyond a slight abnormality that has no more than a minimal effect on the Plaintiff's ability to do basic work activities. Furthermore, the ALJ misstated the results of the MRI from March 2014, stating

31

that there was no foraminal narrowing or spinal stenosis, when, in fact, the MRI shows mild to moderate stenosis at the L4-L5 level, among other findings involving the L5-S1 level and disc desiccation. (Tr. 17-18, 747-748). The EMG study performed in December 2013 also correlates with Plaintiff's complaints of neuropathy and back pain as the results were supportive of a diagnosis of chronic L5-S1 radiculopathy in both lower extremities with evidence of peripheral neuropathy in both lower extremities. (Tr. 524). The ALJ seemingly reinterpreted this medical evidence and concludes that because he believes the MRI does not support the EMG's conclusion, the study results are false; however, that is a lay opinion issued by the ALJ and is not based on any medical evidence or opinion of record.[9]

Moreover, the ALJ's failure to find any impairment as severe is not harmless error because the alternative RFC determination provided by the ALJ is not supported by substantial evidence because the physical limitations of the RFC determination were not based on any medical opinion of record. The ALJ gave

_____

9. In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports. Morales, 225 F.3d at 316-18. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

little weight to the only medical opinion of record, which was that of the state agency physician, because the opinion was rendered before surgical intervention and continuing treatments. (Tr. 19). The ALJ gave no weight to any medical opinion of record in determining the RFC.

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ,

> with the aid of a vocational expert if necessary, can translate
> that medical determination into a residual functional capacity
> determination. Of course, in such a situation a residual
> functional capacity determination is merely a mechanical
> determination, because the regulations clearly and explicitly
> define the various types of work that can be performed by
> claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and

Procedure in Federal Courts, 287-88 (2011) (emphasis added). The administrative

law judge cannot speculate as to a claimant's residual functional capacity, but

must have medical evidence, and generally a medical opinion regarding the

functional capabilities of the claimant, supporting his or her determination. Doak,

790 F.2d at 29 ; see Snyder v. Colvin, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa.

March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the

ALJ's ultimate determination. The ALJ's decision to discredit, at least partially,

every opinion of every medical doctor's RFC assessment of Snyder left the ALJ

without a single medical opinion to rely upon in reaching a RFC determination.

'Rarely can a decision be made regarding a claimant's residual functional capacity

without an assessment from a physician regarding the functional abilities of the

claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS

84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); Wright v. Colvin,

2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.)

("Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical opinion evidence and there was no contrary treating source opinion. Id. '[D]ictum, unlike holding, does not have strength of a decision 'forged from actual experience by the hammer and anvil of litigation.' . . . the only precedential holding in Chandler is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. See Chandler, 667 F.3d at 361-63. . . . Consequently, with regard to lay reinterpretation of medical evidence, Frankenfield, Doak, Ferguson, Kent, Van Horn, Kelly, Rossi, Fowler and Gober continue to bind district Courts in the Third Circuit."); Washburn v. Colvin, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); Maellaro v. Colvin, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) ("The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion. Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the

claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."). *See also Arnold v. Colvin*, 3:12-CV-02417, 2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*, 4:11-CV-00872, 2012 U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012). The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson,

36

and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (M.D. Pa. Feb. 15, 2012) (Conaboy, J.) (Doc. 10) ("Any argument from the Commissioner that his administrative law judges can set the residual function capacity in the absence of medical opinion or evidence must be rejected in light of Doak. Furthermore, any statement in Chandler which conflicts (or arguably conflicts) with Doak is *dicta* and must be disregarded. Government of Virgin Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011) (a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel). "); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39 (M.D. Pa. Jan. 31, 2012) (Munley, J.) (Doc. 14); Crayton v. Astrue, Civil No. 10-1265, slip op. at 38-39 (M.D. Pa. Sept. 27, 2011) (Caputo, J.) (Doc. 17).

In the case at hand, because the ALJ did not rely on any medical opinion of record in determining the RFC, the RFC is not supported by substantial evidence, and it cannot be determined that the ALJ's failure to find any medical impairment as severe was harmless error excusable by any alternative RFC determination. As such, remand is warranted pursuant to 42 U.S.C. § 405(g).

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them

moot.  Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see

LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096,

2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based on the aforementioned discussion, remand under 42 U.S.C.

§ 405(g) is warranted.  Plaintiff's appeal will be granted, the case will be

remanded to the Commissioner for further proceedings, judgment will be entered

in favor of Plaintiff and against Defendant, and the Clerk of Court will be directed

to close this matter.


**DATE**: November 9, 2017          **/s/ William J. Nealon**
                                    **United States District Judge**